UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------X
MICHELLE LYNN,

               Plaintiff,

      - against –

PARAMOUNT GLOBAL, et al.,

               Defendants.

------------------------------X

**MEMORANDUM AND ORDER**
24 Civ. 7219 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

      Plaintiff Michelle Lynn alleges that the horror movie _Apartment 7A_, a prequel to the classic film _Rosemary's Baby_, improperly copies material from her romance novels and short film. Lynn brings claims of copyright infringement and constructive trust against various entities and individuals allegedly associated with _Apartment 7A_.[1] ECF No. 46 ("TAC") ¶¶ 4-11, 43-59.

      Two groups of defendants move to dismiss plaintiff's operative complaint, arguing _inter alia_ that _Apartment 7A_ was created _before_ they allegedly had access to plaintiff's works and that _Apartment 7A_ is wholly dissimilar to plaintiff's works.

      The Court agrees with defendants' arguments and, for the additional reasons that follow, plaintiff's claims are dismissed with prejudice.

---

[1]    Plaintiff brings this action against the following defendants: Paramount Global, Paramount Pictures Corporation (incorrectly named as "Paramount Pictures" in the pleadings), George Cheeks, Caryn Groce, Natalie Erika James, Skylar James, Christian White, and Does 1-5.  TAC ¶¶ 4-11.

**<u>BACKGROUND</u>**

Plaintiff is the author of two romance novels <u>Silver Lights</u> and <u>Silver Heels</u> (collectively, "<u>Silver Lights Book Series</u>"), which were published in October 2019 and March 2020 respectively. TAC ¶¶ 14, 16, 18.  In 2022, plaintiff "wrote, produced, acted, and published a short film based on <u>Silver Heels</u> titled <u>An Ever After Drama</u>."  <u>Id.</u> ¶ 20.[2]  We refer to the <u>Silver Lights Book Series</u> and <u>An Ever After Drama</u> collectively as "plaintiff's works."

Plaintiff alleges that defendants' <u>Apartment 7A</u> "steals many themes, plot points, language, and storylines from <u>The Silver Lights Book Series</u> and short film, <u>An Ever After Drama</u>."  <u>Id.</u> ¶ 24.  According to plaintiff, <u>Apartment 7A</u> "camouflages the storyline with a different genre and throws viewers off with [an] adaptation of <u>Rosemary's Baby</u>."  <u>Id.</u>

## I.  Factual Background

The factual background below recounts defendants' alleged access to plaintiff's works and summarizes the works at issue.

### a. Defendants' Alleged Access to Plaintiff's Works

Plaintiff had a single interaction with defendants before becoming aware of <u>Apartment 7A</u>'s existence.  Plaintiff alleges that "[o]n June 16, 2024, Plaintiff sent an email to Defendant

---

[2]    Plaintiff used quotation marks when referring to the works at issue, while the Court underlines the titles of the works, <u>e.g.</u>, <u>Silver Lights</u> as opposed to "Silver Lights."  All quotation marks plaintiff used for this purpose are omitted unless otherwise indicated.

George Cheeks and Mr. Brian Robbins," employees of Paramount Global, and "inform[ed] them of her work."  TAC ¶¶ 6, 37; TAC Ex. 5.  In this email, plaintiff wrote:

> I wanted to bring the attention of the Paramount team to my boutique company Silver Lights Studios. . . .  I have founded my boutique company with the success of my screenplay portfolio, and my first short film "An Ever After Drama" which is on Amazon Prime in which I wrote, produced, and starred in.  . . .  I have 9 feature movie scripts, a short film and script, and four books that have all won awards.  I know that Paramount will just love my screenplays.  My writing style is original and unique. . . .  Please see highlights below to give you an idea of the awards and highlights.  My scripts are available to read on my websites, and my movie is on the link- short movie tab. . . .  MY MOVIE SCRIPTS WILL BE BOX OFFICE HITS.  PLEASE READ AND SEE MY AWARDS.

TAC Ex. 5.[3]  Plaintiff does not claim that she received a response to this email.  TAC ¶¶ 37, 47; TAC Ex. 5.

Plaintiff asserts that she "became aware of Defendants' movie trailer for the film Apartment 7A from an advertisement on Facebook by Paramount" in September 2024.  TAC ¶ 23.  "Subsequently, Plaintiff sent Defendants a cease[-]and[-]desist letter on September 10, 2024."  Id.; TAC Ex. 4.  Plaintiff brought this lawsuit on September 24, 2024.  ECF No. 1.

---

[3]    There are discrepancies between plaintiff's allegations concerning the email and the email itself.  For example, while plaintiff alleges that defendant Groce received the email, TAC ¶ 47, the header of the email indicates that defendant George Cheeks and non-party Brian Robbins were the only recipients, TAC Ex. 5; see also TAC ¶ 37 (identifying George Cheeks and Brian Robbins as the recipients).  To the extent that plaintiff's allegations conflict with the email, "the document controls and the court need not accept as true the allegations of the complaint."  Zevon v. Dep't Stores Nat. Bank, No. 12 Civ. 4970 (CM), 2013 WL 3479432, at *4 (S.D.N.Y. July 8, 2013) (citation and quotation marks omitted).

Plaintiff filed her initial complaint before she applied for copyright registration of her works and before Apartment 7A was released.  On September 26, 2024, two days after plaintiff filed her initial complaint, see ECF No. 1, plaintiff applied for copyright registration of the Silver Lights Book Series and An Ever After Drama, ECF No. 44 ("Second Amended Complaint") ¶¶ 17, 19, 21.  Shortly after Apartment 7A premiered on September 27, 2024,[4] plaintiff filed her amended complaint on October 1, 2024, which included specific references to scenes in Apartment 7A, see ECF No. 22 ("Amended Complaint") ¶¶ 27, 30-33.  In November 2024, the United States Copyright Office registered plaintiff's works. TAC ¶¶ 17, 19, 21; TAC Exs. 1, 2, 3.[5]

### b. Summary of the Works

Because resolution of the pending motion may turn on whether the works are substantially similar, a "detailed examination of

---

[4]    See PARAMOUNT+ DEBUTS OFFICIAL TRAILER FOR NEW ORIGINAL FILM APARTMENT 7A, PARAMOUNT PRESS EXPRESS (Aug. 29, 2024), https://www.paramountpressexpress.com/paramount-plus/shows/apartment-7a/releases/?view=110209-paramount-debuts-official-trailer-for-new-original-film-apartment-7a (last visited July 1, 2025).  The Court can take judicial notice of this press release.  "[T]he case law applying Rule 201 states that, '[f]or purposes of a 12(b)(6) motion to dismiss, a court may take judicial notice of information publicly announced on a party's website, as long as the website's authenticity is not in dispute and 'it is capable of accurate and ready determination.'"  Lee v. Springer Nature Am., Inc., No. 24 Civ. 4493 (LJL), 2025 WL 692152, at *4 (S.D.N.Y. Mar. 4, 2025) (citations omitted).

[5]    A copyright registration is required to maintain a copyright infringement action.  See 17 U.S.C. § 411(a) ("[N]o civil action for infringement of the copyright in any United States work shall be instituted until preregistration or registration of the copyright claim has been made in accordance with this title.").

the works themselves" is required.  Walker v. Time Life Films, Inc., 784 F.2d 44, 49 (2d Cir. 1986).  The Court summarizes their contents below.[6]

### i. **Silver Lights**

Silver Lights follows the story of Skylar Lynn, an aspiring actress who becomes a dancer at a high-end New York strip club.

Skylar's story begins with multiple flashbacks to her teenage years, which are described as tedious, leaving her "little time to explore her true passion, the field of creative arts."  By the time Skylar is in her thirties, she finds herself working multiple "dead-end jobs . . . and living in a shithole."  Skylar laments her real estate job in particular, noting that it "looked nothing like the hit show Million Dollar Listing, rather a story of a modern-day Cinderella, who, instead of waiting for her Prince

---

[6]    The following summaries are based on the Court's review of Michelle Lynn, SILVER LIGHTS – THE ROLE OF A LIFETIME (2019), Michelle Lynn, SILVER HEELS – AN EVER AFTER DRAMA (2020), An Ever After Drama (Silver Lights Studio 2022), and Apartment 7A (Paramount Pictures Corporation 2024), submitted as exhibits to the Declaration of David Halberstadter in Support of Motion to Dismiss Third Amended Complaint, ECF No. 56, and the Notice of Manual Filing of Physical Exhibits by Defendants Paramount Pictures Corporation and Paramount Global in Support of Motion to Dismiss Plaintiff's Third Amended Complaint, ECF No. 58.  See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002) (permitting courts to consider documents outside the pleadings on a Rule 12(b)(6) motion where documents are integral to the pleading); DiTocco v. Riordan, 815 F. Supp. 2d 655, 658 (S.D.N.Y. 2011) (considering literary works outside the pleading in an analogous context), aff'd, 496 F. App'x 126 (2d Cir. 2012).  To the extent we find that the works deviate from allegations or descriptions contained in plaintiff's Third Amended Complaint, the Court relies solely on the works themselves, which "supersede and control contrary descriptions of them, . . . including any contrary allegations, conclusions or descriptions of the works contained in the pleadings." Peter F. Gaito Architecture, LLC v. Simone Dev. Corp., 602 F.3d 57, 64 (2d Cir. 2010) (internal quotation marks and citation omitted).

Charming, was waiting for her starring role to be handed to her." Meanwhile, her dreams of becoming a leading star "were cut short as she continued to skip out on rehearsals."

One day in 2015, Skylar comes across an advertisement entitled "Upscale Establishment Seeking All Positions," for "New York City's premiere Gentlemen's Club." She quickly becomes "paralyzed with fear" as she can't "believe she was considering becoming a stripper." Though she is anxious, Skylar decides to audition at the club, called "Silver Lights." The audition consists of dancing to a three-minute song in front of Silver Lights' manager Redmond, and by the end of the song, Skylar must remove her clothing while dancing. Despite her panic, Skylar turns out to be a natural and lands the "role of a lifetime."

Once hired by Silver Lights, Skylar adopts the stage name "Soleil," which means "sun" in French. On her first day working at the club, Skylar meets Tony, a veteran of the club business and a former male dancer. Tony advises her that she can look at the position in two ways: "a meal ticket, or a role of a lifetime." Skylar sees her position as the role of a lifetime: by "becoming part of Silver Lights, [Skylar] felt like she was given a second chance to become a star, playing a real character who danced into a spotlight of dreams." During Skylar's first performance at Silver Lights, Tony and Redmond discuss how she is "a real star"

and will "give Silver Lights the national exposure it needs" because of her dancing and "talent for writing."

The rest of the novel details various interactions between the club's management, customers, and employees. Meanwhile, Skylar forms a bond with Lola, a dancer and premiere seller at the club, and both work the VIP section of the club, the champagne room. Skylar notices one of the women that she works with at the real estate office is also a dancer at the club. At the end of the novel, Skylar is warned not to participate in drama between the club employees: "You left a life of ordinary slippers in exchange for an exciting pair of sparkling *Silver Heels* that will keep you shining towards your dream."

### ii. **Silver Heels**

Silver Heels, the sequel to Silver Lights, continues the story of Skylar Lynn, the "star" dancer of an upscale gentlemen's club.[7] During the intervening time between the first and second books in the Silver Lights Book Series, Skylar has learned that "nothing [i]s off limits" "in the playground of exotic entertainment" and earned a reputation as "The Dancing Queen" of Silver Lights.

---

[7]    The novel also focuses on the lives of the club's various customers, employees, and managers, as the novel's introduction promises a "jam-packed, explosive drama with Wall Street scandals, organized crime, and a forbidden love affair." Indeed, the club's clientele apparently includes a crime family that "practically run[s] all strip clubs and restaurants in New York, and in some areas, they run the police" as well as multiple prominent Wall Street businessmen. The Court focuses on Skylar Lynn's storyline, as it is the sole plotline relevant to the issues before us.

Skylar leaves the drama of the nightclub for a moment and seeks refuge at a famous hair salon, where she "take[s] her role up a notch by becoming an eye-catching blonde with lots of ambition." Before the makeover, the hair stylist promises Skylar that her "fairytale is just starting with the magic of my hands and will only get better from here on." After the three-hour makeover, "Skylar is on cloud nine with how good she looks," as this "makeover is just what her new role needs to begin her fairytale with the world's hottest French bachelor and billionaire, Pierre Luca."

Returning to the nightclub, Skylar encounters a Wall Street businessman who does not recognize her as a blonde. She is called on stage, where she "liv[es] up to her new reputation as 'the Dancing Queen.'" "All eyes were on her, especially the lustful eyes of the world-famous billionaire and socialite, Pierre Luca."

Pierre Luca approaches Skylar, "and the whole scene feels like it's out of the movie <u>Pretty Woman</u>." Though Luca has "the reputation as 'The Knight in Shining Amour' when it came to rescuing a modern-day Cinderella like Skylar," his "darkest fantasies were only halfway met at Silver Lights," as he "loved girls he could be himself with, girls who would be happy to be his submissive, following his commands." "Pierre Luca was so powerful that if Skylar played her cards right as his submissive in the

upcoming acts, she would have the doors open in getting her first movie deal." "His conquest with Skylar is just beginning: first thing on his list is to make Skylar feel [l]ike a modern- day Cinderella with expensive lingerie gifts, romantic gestures and orgasmic food that will heat up the fairytale date. Skylar will soon get her first taste of a romantic heroine who knows the art of seduction, kissing, role play and foodgasms."

Skylar is invited to Pierre's home. Before the date, she "ma[kes] herself look like a modern-day Cinderella." When she arrives, Pierre "warmly greets Skylar with a bouquet of white roses," and they toast champagne. Pierre introduces "some ground rules," one of which is that Skylar must refer to him as "Dark Knight." Pierre also explains that he "call[s] the shots here," and that "if [Skylar] plays [her] cards right," he may extend an "invitation to [his] private world," which would include the possibility of becoming his fiancée. Skylar accepts Pierre's rules and is told to change into lingerie before feeding Pierre strawberries. Pierre puts on music, and the two "shuffle into a rhumba, a slow, erotic Latin dance." They stop dancing, and Pierre feeds Skylar his signature dishes. Skylar finds this experience to be enjoyable.

### iii. __An Ever After Drama__

Plaintiff's short film, An Ever After Drama, depicts the scene

in <u>Silver Heels</u> in which Skylar Lynn, the female protagonist, goes on a date with Pierre Luca, a French billionaire.

The eighteen-minute short film opens with Skylar Lynn (played by plaintiff herself) arriving at Pierre's mansion.  As in the novel, Pierre greets Skylar with a bouquet of flowers and starts the date with a toast.  Pierre then explains the "rules" for the evening and suggests that Skylar can become "the very modern embodiment of Cinderella with all the entrapments" if she does everything he asks.

As in the novel, Skylar then accepts Pierre's rules and changes into lingerie and sparkly silver heels before feeding Pierre strawberries.  Pierre puts on Spanish music, and the two dance.  Pierre blindfolds Skylar and feeds her, to which she responds by moaning in delight.  At the end of the short film, Pierre gives Skylar the "Silver Invitation" and asks her to become his princess.

### iv.  **Apartment 7A**

Set in 1960s New York, Paramount's <u>Apartment 7A</u> focuses on Terry Gionoffrio, a struggling dancer who kills herself after being impregnated with Satan's heir.

The movie begins with Terry preparing to perform a Broadway musical number.  Terry suffers a gruesome injury when her ankle suddenly snaps mid-performance.  Unable to work, Terry struggles

to pay rent and takes pills to help manage the pain.

Terry auditions for another Broadway show, and the show's choreographer forces her to repeat the move that injured her over and over again. Desperate and in tears after this painful audition, Terry decides to follow the show's producer Alan Marchand to his apartment building. When she gets there, Terry becomes ill and collapses. Elderly residents Minnie and Roman Castevet take her in, befriend her, and offer her an apartment in the building rent-free. Terry accepts and moves into the building. Unpacking, Terry finds a single ballet slipper labeled "Joan." Minnie informs Terry that Joan, their former tenant, left suddenly, "skipp[ing] out of here like Cinderella at midnight."

The Castevets invite Terry for drinks at Marchand's apartment, but the Castevets back out, leaving only Terry and Marchand at the get-together. Marchand tells Terry that he was curious about the "girl who fell" and "live[s] on the floor below." After talking and chuckling together, the two toast their drinks. Marchand describes the Broadway play he is producing and questions Terry on what "drives" her to dance. Terry describes growing up on a farm after her mother died in an accident. She reveals that dancing is "the only time [she] felt like [she] had control over [her] life" and that she would "do anything to chase that feeling." The two toast again and Terry starts to feel ill. After a

frightening dream in which she is dancing with Marchand and a line of male dancers to Spanish music, Terry wakes up in Marchand's bed unable to remember the night before. He makes her an espresso, implies that they had consensual sex, and tells her that she made the chorus.

Terry later finds out that she is pregnant. Unsure whether she would like to have a child, Terry tells the Castevets her concerns and the Castevets persuade her to give them the baby. More specifically, Roman says: "You'd be giving us a great gift. In return, we'd give you anything you want." Minnie adds: "I know what you want. You want your name up in big, flashy lights." Terry assents and the Castevets announce: "It's settled."

In the middle of the night, one of the other residents breaks into Terry's apartment and tries to kill her. Terry hides in the bathroom. She survives after discovering that the neighbor has collapsed. The next day, Terry finds a hidden passageway between her apartment and the Castevets' apartment. She follows the passageway to find a book filled with Satanic imagery in the Castevets' home.

At rehearsals for Marchand's show, Terry is cast in the lead role when the star of the show suddenly suffers the same ankle injury that previously befell Terry. Terry returns home, and Minnie Castevet cuts Terry's hair to help her fit the part. Terry

remarks that the timing of everything feels strange.  Minnie tells her that she's being ungrateful.  At the end of the haircut, Minnie cuts Terry's ear and says "This is your big break.  This is a role of a lifetime."

Terry finds Joan's name in an old Playbill and visits the theater where Joan had worked.  Joan left all of her belongings there, promising to return to them, but never did so.  Terry finds a rosary and a dog-eared Bible among Joan's belongings.  Terry learns that Joan was being chased when she ran into an oncoming bus, killing her.  Terry attempts to get an abortion, but the practitioner has a painful seizure before completing the procedure.

Terry returns home to find a Satanic temple in the sub-basement of the apartment building.  Marchand tells her that this is where she was impregnated.  She stabs him with a ceremonial dagger and Satan appears.  She flees to her apartment, where the Castevets are waiting for her.  Minnie reminds Terry that they "have a deal[,]" to which Terry responds: "Deal's off."  Terry tries to stab herself in the stomach but cannot do so.  Instead, she ends up writhing in pain on the ground, while Roman explains that Terry has been impregnated with Satan's heir.  Minnie –– referring to Terry's role as the human vessel for Satan's child -- tells her that this is the "role that you were born to play."

Terry seemingly acquiesces.  The Castevets bring her to meet other Satanic congregants to celebrate.  They all raise a toast to Satan.  Kicking off her shoes to dance, Terry tells Minnie: "You were right . . . it's a role of a lifetime."  Terry dances to the window and throws herself out to her death.  The Castevets approach the crime scene around Terry's broken body and spot Rosemary and Guy Woodhouse (the couple in the movie <u>Rosemary's Baby</u>).  The movie ends as Minnie and Roman turn to each other and smile.

## II.  Procedural History

The procedural history set forth below is unusually lengthy, but in summary, plaintiff's counsel unsuccessfully attempted to convert the pending motions to dismiss into a motion for summary judgment.

In November of 2024, defendants Paramount Global and Paramount Pictures Corporation (collectively, "Paramount") filed a pre-motion letter addressing their proposed motion to dismiss. ECF No. 40.  The response from plaintiff's counsel reflected a lack of knowledge about pretrial procedures in federal court.  <u>See</u> ECF No. 41.  Plaintiff's counsel stated that defendants' pre-motion letter, which was filed on the docket in accordance with this Court's Individual Practices, was "an <u>ex parte</u> communication which is not allowed."  <u>Id.</u>  As such, he requested discovery in the case and stated that he did "not wish to waive the ability to

have [defense counsel] sanctioned or removed from the case." Id.
The Court held a conference on November 20, 2024, during which the
Court denied plaintiff's requests, fielded questions from defense
counsel regarding the proper means of filing audiovisual exhibits,
and allowed plaintiff to file an amended complaint before
defendants brought their contemplated motion if "plaintiff,
consistent with Rule 11, believe[d] there [were] additional
allegations to cure any alleged deficiencies raised by defendants'
letter." ECF No. 42.

Plaintiff filed a Second Amended Complaint, see ECF No. 44,
and, one week later, filed a motion for leave to file a Third
Amended Complaint, as she had "received notice of her copyright
registration certifications on December 2, 2024, after the second
amended complaint was filed," ECF No. 45. The Court granted
plaintiff's application. ECF No 48. Consequently, plaintiff's
Third Amended Complaint, ECF No. 46, is the operative pleading at
issue. The Court also granted the parties' joint proposal setting
the briefing deadlines for defendants' motion to dismiss. See ECF
No. 51.

Defendants filed two motions in accordance with the briefing
schedule. In January 2025, Paramount moved to dismiss all three
causes of action for failure to state a claim pursuant to 12(b)(6)
of the Federal Rules of Civil Procedure. See ECF No. 54.

Separately, defendants George Cheeks and Caryn Groce, employees of Paramount Global, moved to dismiss "on the grounds that the TAC includes no allegations that plausibly allege that [they] personally engaged in any infringing or other wrongful conduct whatsoever." ECF No. 59. Defendants Cheeks and Groce also joined in Paramount's motion. See ECF No. 61.

A week later, plaintiff's counsel filed another letter, which was misguided with respect to both the law and the facts. See ECF No. 62. Specifically, counsel wrote that he would "convert the current proceedings to a Motion for Summary Judgment by filing the appropriate motion." Id. After falsely stating that the Court did not allow opposing counsel to file any exhibits, plaintiff's counsel wrote that his "client need[ed] to file an affidavit to protect her interests." Id.[8] Defendants filed a response the same day. See ECF No. 63.

The Court issued a letter the next day, informing plaintiff's counsel that "the law permits the Court, in a copyright infringement case, to compare the works at issue on a motion to

---

[8]    Plaintiff's counsel appears to be plaintiff's father, an undisclosed fact which, while not material to the disposition of this case, perhaps explains counsel's vigorous and confused advocacy.  The June 2024 email to defendants George Cheeks and Brian Robbins is sent from "Michelle Taubman," TAC Ex. 5, which is another name for the plaintiff, see TAC ¶ 47 (identifying the sender as plaintiff); see also ECF No. 66 at 11-12 (affidavit stating that plaintiff's name is "Michelle Lynn Taubman" and her "pen name is Michelle Lynn").  The same email notes that the sender's "father is a lawyer and represents me if you are interested in partnering."  TAC Ex. 5.  In September 2024, "Michelle Taubman" forwards the email to "Dad Taubman" or Bruce Taubman, id., plaintiff's counsel in the instant action, ECF No. 14.

dismiss." ECF No. 64.  The Court directed plaintiff's counsel to provide "further justification for why converting the current proceedings to a motion for summary judgment is appropriate." Id. The Court also ordered plaintiff to "address the relevant caselaw provided in defendants' letter, ECF No. 63," and gave plaintiff's counsel one week to submit a response.  Id.

Plaintiff's response, filed a day after the Court's previous letter, did not address any of the relevant caselaw provided in defendants' letter, ECF No. 63, and simply reiterated plaintiff's request to convert defendants' motion to dismiss into a motion for summary judgment to enable plaintiff to submit an affidavit, ECF No. 65.

Although plaintiff's opposition was not due until February 3, 2025, and although there was an ongoing dialogue between the Court and plaintiff regarding her conversion request, plaintiff filed her opposition to defendants' motion eleven days early, on January 23, 2025, ECF No. 66.  Plaintiff restated her conversion request, noting that defendants attached the film Rosemary's Baby to their motion to dismiss, id. at 8, and attached to her brief a two-page affidavit, outlining supposed similarities between her works and Apartment 7A, id. at 11-12.

On January 23, 2025, the Court filed a letter denying plaintiff's application to convert defendants' motions to dismiss

into a summary judgment motion.  ECF No. 67.  Thus, the Court will simply treat plaintiff's affidavit advocating her position about the works' similarity as further argument.  Id.

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a complaint must include "enough facts to state a claim that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  A court must accept as true all factual allegations in the complaint and draw all reasonable inferences in plaintiff's favor.  See Acticon AG v. China N.E. Petrol. Holdings Ltd., 692 F.3d 34, 37 (2d Cir. 2012). In evaluating the sufficiency of a complaint, a district court may consider documents that are attached to the complaint, incorporated by reference in the complaint, or otherwise integral to the complaint.  See DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010).  The court may also consider "matters of which judicial notice may be taken." Goel v. Bunge, Ltd., 820 F.3d 554, 559 (2d Cir. 2016) (citation and quotation marks omitted).

## DISCUSSION

In the discussion below, we review the viability of each of plaintiff's causes of action. We then separately address the motion brought by defendants Cheeks and Groce.

## I.  Copyright Infringement (First Cause of Action)

Plaintiff's first cause of action is for copyright infringement. TAC ¶¶ 43-50. "Copyright infringement occurs where a plaintiff owns a valid copyright and another person copies its constituent elements." Effie Film, LLC v. Murphy, 564 F. App'x 631, 632 (2d Cir. 2014) (summary order) (internal quotation marks and citations omitted).[9] "In the absence of direct evidence of copying, copyright infringement requires showing: '(a) the defendant had access to the copyrighted work and (b) the substantial similarity of protectible material in the two works.'" Fulks v. Knowles-Carter, 207 F. Supp. 3d 274, 278 (S.D.N.Y. 2016) (citation omitted). We address each factor in turn.

### a. Access

The first factor, access, "means that an alleged infringer had a 'reasonable possibility'—not simply a 'bare possibility'—of hearing the prior work." Jorgensen v. Epic/Sony Recs., 351 F.3d 46, 51 (2d Cir. 2003) (citation omitted). Notably, for access to

---

[9]    The Court assumes that plaintiff owns a valid copyright, as pled in the operative complaint, TAC ¶¶ 17, 19, 21; TAC Exs. 1, 2, 3, though she did not have a copyright when she initially filed the lawsuit, ECF No. 1; ECF No. 44 (Second Amended Complaint) ¶¶ 17, 19, 21; TAC Exs. 1, 2, 3.

be inferred, the alleged infringer must have had a "reasonable opportunity to view plaintiff's work[s] **before creating his own.**" McGraw-Hill Glob. Educ. Holdings, LLC v. Khan, 323 F. Supp. 3d 488, 498 (S.D.N.Y. 2018) (citation and quotation marks omitted; emphasis added). "A plaintiff may show access by presenting facts showing either (i) a particular chain of events by which the defendant might have gained access to the work, or (ii) that plaintiff's work was widely disseminated such that a court can infer access." Greene v. Warner Music Grp., No. 23 Civ. 1555 (KPF), 2024 WL 3045966, at *5 (S.D.N.Y. June 18, 2024) (citations and internal quotation marks omitted), appeal dismissed (Aug. 30, 2024).

### i. Access via a Particular Chain of Events

As for the first means of showing access, plaintiff alleges that defendants gained access to her works via: (a) her June 2024 email to Cheeks and Robbins; and (b) her November 2024 copyright registrations, which "put Defendants on constructive notice." ECF No. 66 at 7; see also TAC ¶¶ 17, 19, 21, 37, 47; TAC Exs. 1, 2, 3, 5.

However, there are no plausible allegations to support plaintiff's wholly conclusory claim. In the first instance, plaintiff fails to allege that her June 2024 email was sent prior to the creation of Apartment 7A, instead alleging that "Defendants

had access to . . . Plaintiff's work" "before Defendants' film had been released or Plaintiff knew about Defendants' film."  TAC ¶ 47.  It simply defies common sense that defendants could have found her works via plaintiff's June 2024 email, distilled them, created a script, cast the required actors, filmed their movie, edited it, and marketed it to the public, all by September 2024.

Beyond the utter implausibility connecting plaintiff's June 2024 email to the creation of Apartment 7A, defense counsel furnished plaintiff's counsel with hard evidence regarding the timeline of the movie-making process.  According to defense counsel's declaration, "principal photography on [the] Picture commenced on April 4, 2022, and concluded on May 31, 2022; that 're-shoots' were done from May 9 - 14, 2023; and that, therefore, the Picture was substantially completed more than *two years before*, and fully filmed *more than a year before*, Plaintiff claims to have sent her email to Paramount executives."  ECF No. 56 ¶ 11 (emphasis in original).  While on a motion to dismiss the Court cannot take judicial notice of defense counsel's declaration and corresponding exhibits,[10] the Court can take judicial notice of other publicly

_____

[10]    In support of this assertion, defense counsel attaches to his declaration the cover page of two versions of the "Final Shooting Script."  ECF No. 56 ¶ 11, Ex. F.  The "Court is not entitled to take judicial notice of that declaration, see Fed. R. Evid. 201(b), and the declaration was not attached to, incorporated by reference into, or integral to the Amended Complaint."  Bus. Casual Holdings, LLC v. YouTube, LLC, No. 21 Civ. 3610 (JGK), 2022 WL 17177970, at *5 n.4 (S.D.N.Y. Nov. 22, 2022) (citation omitted), aff'd, No. 22-3007-CV, 2023 WL 6842449 (2d Cir. Oct. 17, 2023); see also HB v. Monroe Woodbury Cent. Sch. Dist., 2012 WL 4477552, at *5 (S.D.N.Y. Sept. 27, 2012) ("[I]t is generally

available documents which provide a timeline of the movie's creation and production. For example, according to the Copyright Office's registry, Apartment 7A was preregistered with the Copyright Office in May 2022,[11] more than two years before plaintiff's June 2024 email, TAC Ex. 5. In addition, Paramount announced the film's release and provided a short summary of the film's plot in April 2024,[12] more than fifty days before plaintiff's June 2024 email, TAC Ex. 5.

Further, plaintiff cannot rely on her copyright registrations to show that defendants had access to her works before Apartment 7A was created. Plaintiff did not apply for copyright registration

---

improper to consider factual averments ... contained in an attorney affidavit on a 12(b)(6) motion.") (collecting cases). However, as noted above, the Court can take judicial notice of certain facts which appear in publicly available materials.

[11]    See Apartment 7A, Registration No. PRE000012437 (May 19, 2022), https://publicrecords.copyright.gov/detailed-record/voyager_33967189 (last visited July 1, 2025). The Court may take "take judicial notice of [defendants'] federal copyright registrations, as published in the Copyright Office's registry." Island Software & Computer Serv., Inc. v. Microsoft Corp., 413 F.3d 257, 261 (2d Cir. 2005).

[12]    See Paramount+ Announces Apartment 7A, a new original film starring Golden Globe winner Julia Garner, to premiere this fall, PARAMOUNT PRESS EXPRESS (Apr. 26, 2024), https://www.paramountpressexpress.com/paramount-plus/shows/apartment-7a/releases/?view=109743-paramount-announces-apartment-7a-a-new-original-film-starring-golden-globe-winner-julia-garner-to-premiere-this-fall (last visited July 1, 2025). The Court can take judicial notice of this press release. "[T]he case law applying Rule 201 states that, '[f]or purposes of a 12(b)(6) motion to dismiss, a court may take judicial notice of information publicly announced on a party's website, as long as the website's authenticity is not in dispute and 'it is capable of accurate and ready determination.'" Lee, 2025 WL 692152, at *4 (citations omitted). Specifically, the Court is taking judicial notice of the fact that this press release contained these statements, without regard to the truth of their contents. See id.

until several days <u>after</u> this lawsuit was filed.  <u>See</u> ECF No. 1;
ECF No. 44 (Second Amended Complaint) ¶¶ 17, 19, 21.  Plaintiff
herself did not "receive[] notice of her copyright registration
certifications [until] December 2, 2024, after the second amended
complaint was filed," ECF No. 45, and months after <u>Apartment 7A</u>
was released in September 2024, <u>id.</u>; TAC ¶¶ 17, 19, 21; TAC Exs.
1, 2, 3; ECF Nos. 1, 22.  Moreover, a "valid copyright is not, as
[p]laintiff seems to suggest, probative of access."  <u>Warner v.
Amazon.com, Inc.</u>, No. 22 Civ. 05907 (ALC), 2023 WL 6317954, at *8
(S.D.N.Y. Sept. 28, 2023).

Simply put, plaintiff's allegations are fanciful, and do not
establish that defendants had a "reasonable opportunity to view
plaintiff's work[s] before creating [their] own."  <u>McGraw-Hill</u>,
323 F. Supp. 3d at 498 (citation and quotation marks omitted); <u>see
also</u> <u>Greene</u>, 2024 WL 3045966, at *7 (granting motion to dismiss
because "[p]laintiff's theory . . . is too attenuated to establish
that [d]efendants had access to h[er] [w]orks"); <u>Basile v.
Twentieth Century Fox Film Corp.</u>, No. CV144263 (DMG) (JPRX), 2014
WL 12521340, at *2 (C.D. Cal. Aug. 19, 2014) (granting motion to
dismiss after taking judicial notice of screenplay's copyright
registration and noting that the screenplay was registered months
before plaintiff's email providing access to his works), <u>aff'd</u>,
678 F. App'x 576 (9th Cir. 2017).

### ii. Access via Wide Dissemination of Plaintiff's Works

As for the second theory of inferring access, plaintiff argues that her works should be considered "widely disseminated" because (a) her books and short film are available on her website and Amazon and (b) "Plaintiff has won 12 book awards for The Silver Lights Book Series and over 160 awards for her short film An Ever After Drama based on the book series." ECF No. 66 at 7; see also TAC ¶ 22 (similar).

A "work is widely disseminated when it has had considerable commercial success or is readily available on the market." Webb v. Stallone, 910 F. Supp. 2d 681, 686 (S.D.N.Y. 2012) (citation and quotation marks omitted). "Bestsellers, saturation radio campaigns on a nationwide basis, blockbuster motion pictures, and other works that have been 'widely disseminated' are all available for others to imitate." 4 Nimmer on Copyright § 13D.05 (2025) (collecting cases). However, "the mere fact that [plaintiff's] work was posted on the internet prior to the creation of defendants' work is insufficient by itself to demonstrate wide dissemination." O'Keefe v. Ogilvy & Mather Worldwide, Inc., 590 F. Supp. 2d 500, 515 (S.D.N.Y. 2008) (collecting cases).

Neither the availability of plaintiff's works on her website and Amazon, nor plaintiff's invocation of unspecified "awards" permits the Court to infer that plaintiff's works were widely

-24-

disseminated such that defendants had access to them.  For example, plaintiff provides no allegations sufficient to demonstrate how many people viewed her movie, which was first published in 2022.  See, e.g., Clanton v. UMG Recordings, Inc., 556 F. Supp. 3d 322, 328 (S.D.N.Y. 2021) (dismissing claim "[i]n the absence of specific facts showing that the Subject Composition was widely accessed on the internet before publication of the allegedly infringing work"); Novak v. Nat'l Broad. Co., 752 F. Supp. 164, 170 (S.D.N.Y. 1990) (finding insufficient evidence of wide dissemination where copyrighted skit was broadcast on a national satellite superstation four times); ABKCO Music, Inc. v. Harrisongs Music, Ltd., 722 F.2d 988, 997-98 (2d Cir. 1983) (finding sufficient evidence of wide dissemination where in the year of the alleged access, the infringed song was "Number One" on the *Billboard Charts* in the United States for five weeks and was one of the "Top Thirty Hits" in England for seven weeks).

**b. Substantial Similarity**

Even if we assume arguendo that defendants had access to plaintiff's works, plaintiff's operative complaint must also establish that Apartment 7A is "substantially similar" to plaintiff's works.  In the section below, we review the substantial similarity standard as established by relevant case law and apply it to plaintiff's claim.

### i. Standard

Works are substantially similar if an "ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard the aesthetic appeal as the same." Peter F. Gaito Architecture, LLC, 602 F.3d at 66 (citation and quotation marks omitted). "If the similarity concerns only noncopyrightable elements of a plaintiff['s] work," or if the works are not substantially similar as a matter of law, dismissal is appropriate. Williams v. Crichton, 84 F.3d 581, 587 (2d Cir. 1996) (citation and quotation marks omitted).

When determining which elements of a work are noncopyrightable, we are mindful of a "principle fundamental to copyright law: a copyright does not protect an idea, but only the expression of an idea." Kregos v. Associated Press, 3 F.3d 656, 663 (2d Cir. 1993); see also 17 U.S.C. § 102(b) ("In no case does copyright protection for an original work of authorship extend to any idea[,] . . . concept, [or] principle, . . . regardless of the form in which it is described, explained, illustrated, or embodied in such work."). Similarly, scènes à faire, or "sequences of events that necessarily result from the choice of a setting or situation, do not enjoy copyright protection." Brown v. Perdue, No. 04 Civ. 7417 (GBD), 2005 WL 1863673, at *6 (S.D.N.Y. Aug. 4, 2005) (citation omitted), aff'd, 177 F. App'x 121 (2d Cir. 2006).

In assessing whether the at-issue works are substantially similar, the Court's analysis "is not simply a matter of ascertaining similarity between components viewed in isolation." Tufenkian Imp./Exp. Ventures, Inc. v. Einstein Moomjy, Inc., 338 F.3d 127, 134 (2d Cir. 2003) (emphasis omitted). Rather, the Court must scrutinize the similarities in aspects like the plot, characters, setting, themes, and total concept and overall feel. See Williams, 84 F.3d at 588. This comparison is "instructed by our good eyes and common sense." Peter F. Gaito Architecture, LLC, 602 F.3d at 66 (citation and quotation marks omitted).[13]

### ii. Comparison of Works

With these principles in mind, we carefully review the relevant works' plot, characters, setting, themes, and total concept and overall feel. Based on our exhaustive examination, we conclude that Apartment 7A and plaintiff's works are nothing alike, let alone substantially similar.

### 1. Plot

As the Court's synopses of the works makes clear, supra pp. 4-14, the storyline of Apartment 7A is entirely different from

---

[13]   For the sake of completeness, we reject plaintiff's argument that a decision on defendants' motion to dismiss would violate her Seventh Amendment right to a jury trial. ECF No. 66 at 9. As this Court has repeatedly explained to plaintiff's counsel, ECF Nos. 64, 67, "[t]he question of substantial similarity is by no means exclusively reserved for resolution by a jury . . . and  . . . it is entirely appropriate for a district court to resolve that question as a matter of law," Peter F. Gaito Architecture, LLC, 602 F.3d at 63.

those in plaintiff's works.  In <u>Apartment 7A</u>, a struggling dancer kills herself after she is raped and impregnated with Satan's heir. Plaintiff's works, meanwhile, follow the story of an ambitious writer/dancer who learns that "nothing was off limits" "in the playground of exotic entertainment."  In short, we do not credit plaintiff's frankly risible allegation that <u>Apartment 7A</u> "steals many . . . plot points, language, and storylines from <u>The Silver Lights Book Series</u> and short film, <u>An Ever After Drama</u>."  TAC ¶ 24.

Unsurprisingly, plaintiff attempts to support her claim by "emphasiz[ing] random similarities scattered throughout the works."  <u>Williams</u>, 84 F.3d at 590 (citation and quotation marks omitted).  Once examined in any detail, however, these isolated examples prove to be exceedingly dissimilar.  In fact, "Plaintiff's alleged similarities consist almost entirely of clearly defined ideas not original to plaintiff and . . . to the very limited extent that there are even any superficial similarities, these are overwhelmed by the works' vastly different creative choices and overall aesthetic feel."  <u>Fulks</u>, 207 F. Supp. 3d at 279–80.

Plaintiff initially argues that "the first 20 minutes of scenes in <u>Apartment 7A</u>, specifically minutes 1-22:51" was "taken and used" from chapters 1-6 in <u>Silver Lights</u>.  ECF No. 66 at 11. This bizarre claim is belied by even a cursory review of the works.

-28-

The following sequence appears in <u>none</u> of plaintiff's works: the female protagonist prepares to perform a Broadway musical number and suffers a gruesome ankle injury mid-performance.  The female protagonist takes pills for her pain and is cruelly rejected at an audition for another play.  This sequence <u>only</u> appears in <u>Apartment 7A</u>.

Nor do we credit plaintiff's baseless argument that "[t]he casting process in <u>Apartment 7A</u> is taken from <u>Silver Lights</u> based on the type of dance and horror made into theatrical drama."  ECF No. 66 at 12.  The Court finds that these similarities are "<u>scènes à faire</u>, flowing naturally from 'identical situations.'"  <u>Nobile v. Watts</u>, 289 F. Supp. 3d 527, 534 (S.D.N.Y. 2017), <u>aff'd,</u> 747 F. App'x 879 (2d Cir. 2018).  Just as "drunks, prostitutes, vermin and derelict cars . . . appear in any realistic work about the work of policemen in the South Bronx," <u>id.</u> (citation and quotation marks omitted), audition scenes will naturally appear in any work about an aspiring entertainer in New York.[14]

Still within the first twenty minutes of <u>Apartment 7A</u>,

---

[14]    The same conclusion applies to plaintiff's argument that <u>Apartment 7A</u> took "Chapter 6 'A Star' from <u>Silver Lights</u> . . . and changed it around with genre, characters, and type of dance."  ECF No. 66 at 11.  The referenced chapter merely states Skylar Lynn "always dreamed of being a star," but "was scraping by on nothing, working three jobs to stay afloat, and living in a rundown New York City studio."  That Terry in <u>Apartment 7A</u> also dreams of being a star and lives in dilapidated circumstances flows naturally from being an aspiring entertainer in New York.  Moreover, plaintiff's concession that the two differ in terms of "genre, characters, and type of dance," ECF No. 66 at 11, means that no reasonable juror would mistake the two works as one and the same.

plaintiff argues that "[t]he use of Terry's dizzy spells and pills in Apartment 7A is taken from the flashing silver lights in Silver Lights to provide the illusion of the flashing lights in the Silver Lights book and trailer."  ECF No. 66 at 11.  This is baseless.  Terry's dizzy spells and pill consumption reveal the character's fragile and vulnerable nature, which makes her more susceptible to being taken in by the seemingly sweet Castevets.  On the other hand, flashing lights appear in plaintiff's works to "guide [the main character's] heart and soul faithfully towards reaching her vision as she is given a second chance at bringing her god-given talent back to life through the role as an exotic dancer."  The argument that these constitute plot similarities (let alone similarities relating to protectable elements of plaintiff's works) reflects, at best, an inexcusable ignorance of the substance of the works and, at worst, bad faith on the part of plaintiff and her counsel.

Plaintiff's next set of arguments focus on the scene in Apartment 7A in which Terry is tricked into having drinks with Marchand.  Plaintiff claims that there are multiple similarities between this sequence and aspects of her works.

In Apartment 7A, shortly before she attends the drinks with Marchand, Terry changes into a pair of red heels.  Plaintiff alleges that this outfit change copies a scene in her short film

where plaintiff's character "slips on her silver heels and is transformed." TAC ¶ 30. These scenes are wholly dissimilar. First, the red shoes in Apartment 7A do not look like the silver heels in An Ever After Drama. Secondly, these scenes serve drastically different functions in each work's plot. In Apartment 7A, Terry is merely dressing for what she believes to be a cocktail party and is not "transformed." By contrast, in plaintiff's works, plaintiff's character puts on silver heels and lingerie that her romantic interest sets out for her in hopes that she will be invited into his private world. She is "transformed" by the thrill of doing her romantic interest's bidding and the possibility of being his fiancée one day.

Plaintiff next asserts that minutes 23:21-31:20 of Apartment 7A, which depict Terry having drinks with Marchand, is "cop[ied] straight from Plaintiff's short film." TAC ¶ 36. Namely, plaintiff argues that this scene "incorporate[s] the same format scene and copies key elements of . . . Silver Heels . . . and An Ever After Drama." ECF No. 66 at 11. This brazen assertion could not be further from reality. The scene in Apartment 7A depicts the female protagonist being tricked into having one-on-one drinks at a Satan worshipper's apartment. While there, she discusses how her mother's accidental death "drives her to dance." She is then drugged and raped while a choreographed dance plays out in a dream

sequence.  On the other hand, plaintiff's works depict a female protagonist being willingly swept off her feet by a French billionaire who feeds her strawberries among other dishes.[15]

Plaintiff also alleges that the scene -- consisting of "a toast and sexual language" -- copies a scene in plaintiff's short film in which the "characters have a drink and a toast" with a "flirty undertone to the scene."  TAC ¶ 33.  Plaintiff's copyright claim cannot rely upon such a "broad plot idea, or premise," as it "is not a protectible element."  Sheldon Abend Revocable Tr. v. Spielberg, 748 F. Supp. 2d 200, 208 (S.D.N.Y. 2010).  Moreover, "the expression of the . . . plot idea is quite different" meaning that "such similarity is not, standing alone, indicative of substantial similarity."  Id.

Following the scene in Apartment 7A in which Terry and Marchand have drinks, Terry hallucinates that she is dancing with Marchand and a line of male dancers to Spanish music.  The audience later finds out that during this time, Terry is being raped and impregnated.  Plaintiff claims that this scene in Apartment 7A copies a scene from her short film where her character "starts

---

[15]    Plaintiff specifically claims that these scenes are similar and share the following "key elements:" "one room, cues, music, fashion, movements, points in dialogue, a toast, first dates, both protagonists come in hope of dreams but told in different genres, romantic elements, ballroom dance, the music for the dance, and movement."  ECF No. 66 at 11.  Putting aside that these "elements" are expressed in drastically different fashions, many of these elements are noncopyrightable ideas, such as "one room" and "first dates."

ballroom dancing to 'Red Hot Rhumba' music" after "chang[ing] into lingerie." TAC ¶ 34. These scenes are so different that one wonders if plaintiff and her counsel reviewed defendants' work.[16] These incongruent ideas are expressed in different manners as well. In Apartment 7A, a line of male dancers accompany Terry in a choreographed number, while in plaintiff's work, a single couple attempts to seduce each other through dance.

At the end of this sequence in Apartment 7A, after Terry wakes up and is unable to remember the night before, Marchand implies that they had consensual sex and tells her that she "made the chorus." Plaintiff alleges that this scene copied a scene from her short film "where the main character finally gets her invitation to dance." TAC ¶ 35. Again, this superficial similarity is a scène[] à faire, flowing naturally from 'identical situations,'" as both characters are aspiring entertainers in New York. Nobile, 289 F. Supp. 3d at 534.

Plaintiff's baseless allegations continue. According to the complaint, "[t]here are stolen scenes from Plaintiff's book series in Defendants' movie such as when Defendants' character gets a haircut and transforms dramatically is the same as when Plaintiff's character also gets a haircut and has a major transformation."

---

[16]    Tellingly, plaintiff brought this suit before the film was even released. ECF Nos. 1, 22.

TAC ¶ 28.  These scenes serve such radically different purposes in their respective works that no reasonable juror could mistake them for each other.  In Apartment 7A, Terry is not "transformed": she receives a haircut from Minnie after receiving the lead role in a Broadway show, Minnie ominously tells her that she's being ungrateful, and Minnie cuts her ear out of spite.  Conversely, plaintiff's main character is "transformed" into a blonde bombshell, as she ambitiously tries to work her way to the top of the gentlemen's club where she's employed.

Similarly, plaintiff alleges: "Plaintiff's and Defendants' characters are saved by other characters who set them up for success on their journey in New York City."  TAC ¶ 26.  This plot point cannot serve as the basis for a copyright infringement claim, as it is too broad.  Plaintiff's allegation is also a gross mischaracterization of defendants' work.  In Apartment 7A, Terry is not saved by the Castevets or Marchand.  Instead, she is raped, impregnated, and coerced into a coven of Satan worshippers.

### 2. Characters

"The bar for substantial similarity in a character is set quite high."  Spielberg, 748 F. Supp. 2d at 208.  "Clearing the bar is no easy feat—for example, self-centered bachelors in their mid-thirties who pursued love interests and became trapped in a repeating day—have not been considered substantially similar since

-34-

the similarities existed at 'a level of abstraction[ ] too basic' to permit an inference of unlawful copying." <u>Nobile</u>, 289 F. Supp. 3d at 535 (citation omitted).

Skylar Lynn in plaintiff's works and Terry Gionoffrio in <u>Apartment 7A</u> share superficial similarities in that they are both aspiring entertainers in New York City. <u>See</u> TAC ¶¶ 25-27, 32; ECF No. 66 at 11-12. However, this character idea "is far too generalized to be protectable." <u>Kassel v. Moynihan</u>, No. 23 Civ. 6958 (JLR), 2024 WL 2832813, at *5 (S.D.N.Y. June 3, 2024). Indeed, "[c]ourts in this circuit have routinely denied character infringement claims sharing far more similar characteristics and features." <u>Abdin v. CBS Broad. Inc.</u>, 971 F.3d 57, 72 (2d Cir. 2020) (collecting cases). Put simply, the alleged similarities are too "'basic' to permit an inference of unlawful copying." <u>Nobile</u>, 289 F. Supp. 3d at 535 (citation omitted).

### 3. Setting

Plaintiff's works are set in modern-day New York City, while <u>Apartment 7A</u> is set in 1960s New York City. "[T]he setting of New York City is not a protectible element of a copyrighted work." <u>Hallford v. Fox Ent. Grp., Inc.</u>, No. 12 Civ. 1806 (WHP), 2013 WL 541370, at *7 (S.D.N.Y. Feb. 13, 2013) (collecting cases), <u>aff'd</u>, 556 F. App'x 48 (2d Cir. 2014). Thus, this superficial similarity in setting cannot serve as a basis to sustain plaintiff's claim.

**4. Themes**

The relevant works' themes are markedly distinct. Plaintiff's works depict a wish fulfillment fantasy, in which the down-on-her-luck main character is recognized as inherently special and awarded extravagant romantic and work-related opportunities as a result. Apartment 7A depicts the flip-side of the same coin: the down-on-her-luck main character makes a "deal with the devil" to get what she wants, only to realize that the price to pay is too steep.[17] "[T]he tonal difference is reinforced by the two works' entirely different endings." Green v. Lindsey, 885 F. Supp. 469, 482 (S.D.N.Y. 1992), aff'd, 9 F.3d 1537 (2d Cir. 1993). Skylar Lynn gets what she wants –- the attention of a French billionaire and a job as a stripper -- in plaintiff's works, while Terry kills herself in Apartment 7A.

Plaintiff argues that: "Chapter 2 of Silver Lights is titled 'Broken Glass' and Apartment 7A steals this unique theme." ECF No. 66 at 12. In plaintiff's work, "Broken Glass" refers to the "parts of Skylar's broken spirit," as her "shattered dreams of becoming a Hollywood star were instantaneously washed away into the dirty gutter." The Court acknowledges that, distilled to the highest levels of abstraction, Apartment 7A includes a similar

---

[17]    Apartment 7A also explores the exploitation of pregnant women and the loss of female autonomy, themes not found in plaintiff's works.

theme, as Terry's dream is also shattered when she injures her ankle.  However, this broad similarity is "overwhelmed by the works' vastly different creative choices and overall aesthetic feel."  Fulks, 207 F. Supp. 3d at 279-80.

Plaintiff's other alleged parallels are lacking in any support.  Plaintiff claims copyright protection over two themes that are admittedly derived from other sources.  She argues: "My Cinderella theme is used in both Silver Lights and Silver Heels, along with An Ever After Drama was used in Apartment 7A to highlight 'the role of a lifetime' theme."  ECF No. 66 at 12; see also TAC ¶ 29 (similar).  She also argues that "Apartment 7A takes" an idea from Chapter 9 of Silver Lights, which is called "Dirty Dancing," by including a "dance scene emulating Jennifer Grey's Dirty Dancing with song, fashion, and dance to incorporate borrowed unique ideas from this chapter which brought light to interweaving this theme."  ECF No. 66 at 12.

There are, obviously, several issues with plaintiff's arguments.  First, plaintiff cannot claim copyright ownership over an idea.  See 17 U.S.C. § 102(b).  Second, plaintiff cannot claim copyright ownership over an idea which "did not originate with plaintiff."  Fulks, 207 F. Supp. 3d at 282.  Third, Apartment 7A does not have a Dirty Dancing theme and only mentions Cinderella in passing.

-37-

Plaintiff also alleges that the theme of being given "a role of a lifetime" is shared between her works and Apartment 7A because Minnie Castevet says that "this is a role you were born to play." TAC ¶ 31.   Ordinary phrases like this one do not constitute protected expressions and cannot support a claim of substantial similarity.   See Lewinson v. Henry Holt & Co., LLC, 659 F. Supp. 2d 547, 571 (S.D.N.Y. 2009) (citing support for the proposition that expression through metaphor is protectable only if it is sufficiently original); Arica Inst., Inc. v. Palmer, 970 F.2d 1067, 1072 (2d Cir. 1992) ("[T]he 'ordinary' phrase may be quoted without fear of infringement....").

### 5. Total Concept and Overall Feel

Finally, the Court finds no protectable similarities between the works' total concept and overall feel.   For one, as described above, the works are substantially dissimilar in terms of plot, characters, setting, and themes.   While differences alone may not excuse actual infringement, "the Second Circuit has observed that 'numerous differences tend to undercut substantial similarity.'"   Adsani v. Miller, No. 94 Civ. 9131 (DLC), 1996 WL 194326, at *3 (S.D.N.Y. Apr. 22, 1996) (quoting Warner Bros. Inc. v. Am. Broad. Companies, Inc., 720 F.2d 231, 241 (2d Cir. 1983)).

Further distinguishing the concept and feel of the works is the pacing and mood.   In keeping with its trappings as a typical

psychological drama, <u>Apartment 7A</u> proceeds at an ominous and unsettling clip.  In keeping with romance novels, plaintiff's works tend to move at a quicker pace, while her short film is slow and erotic.

In sum, <u>Apartment 7A</u> is vastly different from plaintiff's works, sharing next to nothing with plaintiff's works in terms of plot, characters, setting, themes, total concept, or overall feel. The Court has little trouble concluding that the two works are not substantially similar as a matter of law.  Accordingly, plaintiff has failed to plausibly allege the misappropriation of protectable expression, and defendants' motion to dismiss is granted in its entirety.[18]

## II.  Contributory and Vicarious Copyright Infringement (Second Cause of Action)

Plaintiff's second cause of action is for vicarious and/or contributory copyright infringement.  TAC ¶¶ 51-55.

Though Paramount moved to dismiss this claim, ECF Nos. 54 at 2, 55 at 21, plaintiff's opposition does not mention, let alone

---

[18]    Plaintiff seemingly suggests that her copyright claim may survive under the fragmented literal similarity test.  ECF No. 66 at 7 (arguing "substantial similarity can be found in a copyright infringement that only involves a small portion of each work" and citing <u>Burroughs v. Metro-Goldwyn-Mayer, Inc.</u>, 683 F.2d 610, 624 n. 14 (2d Cir. 1982)).  "[C]ases of fragmented literal similarity" "involve literal copying."  <u>May v. Sony Music Ent.</u>, 399 F. Supp. 3d 169, 181 (S.D.N.Y. 2019) (quotation marks and citation omitted).  However, "the Court has reviewed the works themselves, and has observed that there are no sequences – even brief sequences – in the works depicting exact or nearly exact copying." <u>Kassel v. Moynihan</u>, No. 23 Civ. 6958 (JLR), 2024 WL 2832813, at *7 (S.D.N.Y. June 3, 2024).  Thus, plaintiff's claim fails even if the fragmented literal test is used.

defend, this cause of action, ECF No. 66.  Plaintiff's approach constitutes abandonment of this claim and, thus, plaintiff's second cause of action is dismissed.  See Jackson v. Federal Express, 766 F.3d 189, 195—99 (2d Cir. 2014) ("[I]n the case of a counseled  party, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned."); McLeod v. Verizon N.Y., Inc., 995 F. Supp. 2d 134, 143 (E.D.N.Y. 2014) ("[C]ourts in this circuit have held that a plaintiff's failure to respond to contentions raised in a motion to dismiss claims constitute an abandonment of those claims." (internal quotations and alterations omitted)); Rowe v. Old Dominion Freight Lines, Inc., No. 21 Civ. 4021 (KMK), 2022 WL 2181619, at *7 (S.D.N.Y. June 16, 2022) (dismissing complaint and finding arguments abandoned where "Plaintiffs choose to dispute some, but not all, of Defendant's arguments").

Nonetheless, in the interest of completeness, we address why plaintiff's concession is appropriate and required by the law. "[T]here can be no contributory infringement absent actual infringement," Faulkner v. Nat'l Geographic Enters. Inc., 409 F.3d 26, 40 (2d Cir. 2005) (citation omitted), "and no vicarious infringement absent direct infringement," Williams v. A & E Television Networks, 122 F. Supp. 3d 157, 165 (S.D.N.Y. 2015)

(citation omitted).    Because plaintiff's direct copyright infringement claim fails, <u>supra</u> pp. 19-39, her claim of contributary and vicarious copyright infringement must be dismissed as well.

## III. Constructive Trust (Third Cause of Action)

Plaintiff's third cause of action is for constructive trust. TAC ¶¶ 56-59.  As with plaintiff's second cause of action in the face of Paramount's motion to dismiss, ECF Nos. 54 at 2, 55 at 21-22, plaintiff does not defend her constructive trust cause of action, ECF No. 66.  Plaintiff has thus abandoned her constructive trust claim, thereby warranting its dismissal.  <u>See</u> <u>Jackson</u>, 766 F.3d at 195—99; <u>supra</u> pp. 39-41.

In any event, plaintiff's constructive trust claim is subject to dismissal because it is preempted by the Copyright Act.  <u>See,</u> <u>e.g.</u>, <u>Gary Friedrich Enterprises, LLC v. Marvel Enterprises, Inc.</u>, 713 F. Supp. 2d 215, 222 (S.D.N.Y. 2010) (finding "claim for a constructive trust in connection with unauthorized use of copyrightable work" to be preempted); <u>Bray v. Purple Eagle Ent.</u>, Inc., No. 18 Civ. 5205 (GBD) (SLC), 2024 WL 553961, at *8 (S.D.N.Y. Jan. 3, 2024) (same), <u>report and recommendation adopted</u>, No. 18 Civ. 5205 (GBD) (SLC), 2024 WL 4144063 (S.D.N.Y. Sept. 11, 2024).

## IV.  Cheeks and Groce's Motion to Dismiss

Defendants George Cheeks and Caryn Groce, employees of

Paramount Global, moved to dismiss "on the grounds that the TAC includes no allegations that plausibly allege that [they] personally engaged in any infringing or other wrongful conduct whatsoever." ECF No. 59.

Plaintiff did not respond to this motion to dismiss at all, ECF No. 66, and has thus abandoned her claims against these defendants, see Jackson, 766 F.3d at 195—99; supra pp. 39-41. Moreover, plaintiff's claims against Groce and Cheeks must be dismissed, as plaintiff's third amended complaint wholly fails to state any plausible claims against them or generally, supra pp. 19-41.

## CONCLUSION

For the foregoing reasons, defendants' motions to dismiss are granted with prejudice. We also dismiss plaintiff's third amended complaint as to non-moving defendants Natalie Erika James, Skylar James, Christian White, and Does 1-5 "because the issues concerning [the non-moving defendants] are substantially the same as those concerning the other defendants, and [plaintiff] . . . had notice and a full opportunity to make out [her] claim[.]" Hecht v. Commerce Clearing House, 897 F.2d 21, 26 n.6 (2d Cir. 1990); see also Whitfield v. O'Connell, No. 09 Civ. 1925 (WHP), 2010 WL 1010060, at *7 (S.D.N.Y. Mar. 18, 2010) ("A district court has the power to sua sponte dismiss claims against nonmoving defendants

-42-

for failure to state a claim, as long as the plaintiff has been given an opportunity to be heard."), aff'd, 402 F. App'x 563 (2d Cir. 2010).   The Clerk of Court is respectfully directed to terminate all pending motions, enter judgment for all defendants, and close the case.

Dated:     July 11, 2025
           New York, New York

_____
        NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE